[Cite as *State v. Bennett*, 2014-Ohio-160.]

STATE OF OHIO        )                IN THE COURT OF APPEALS
                         )ss:            NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN    )

STATE OF OHIO                  C.A. No.       12CA010286

      Appellee

      v.                              APPEAL FROM JUDGMENT
                                   ENTERED IN THE
TEVIN M. BENNETT           COURT OF COMMON PLEAS
                                   COUNTY OF LORAIN, OHIO
      Appellant              CASE No.    11CR084132

DECISION AND JOURNAL ENTRY

Dated: January 21, 2014

---

WHITMORE, Judge.

{¶1}　Appellant, Tevin Bennett, appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I

{¶2}　In the early morning hours of November 14, 2011, shots were fired into the home located at 422 Kentucky Avenue in Lorain, Ohio. The following day, several men attempted to enter the home of a tattoo artist to rob him. The tattoo artist, however, was able to thwart the attack. Bennett was indicted in connection with both of these incidents. The grand jury issued separate indictments on the same day.

{¶3}　In case number 11CR084132, related to the shooting into the Kentucky Avenue home, Bennett was indicted on: (1) felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with firearm and repeat violent offender specifications; (2) improperly discharging a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1), a

felony of the second degree, with firearm and repeat violent offender specifications; (3) tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree; and (4) having a weapon while under disability, in violation of R.C. 2923.13(A)(2), a felony of the third degree, with a firearm specification.

{¶4} In case number 11CR084219, related to the attempted robbery of the tattoo artist, Bennett was indicted on: (1) aggravated burglary, in violation of R.C. 2911.11(A)(1), a felony of the first degree, with firearm and repeat violent offender specifications; (2) aggravated burglary, in violation of R.C. 2911.11(A)(2), a felony of the first degree, with firearm and repeat violent offender specifications; and (3) felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with firearm and repeat violent offender specifications.

{¶5} The grand jury issued a third indictment against Bennett on that same day. In case number 11CR084144,[1] Bennett was indicted on: (1) aggravated robbery, in violation of R.C. 2911.01(A)(1), a felony of the first degree, with firearm and repeat violent offender specifications; and (2) having a weapon while under disability, in violation of R.C. 2923.13(A)(2), a felony of the third degree, with a firearm specification.

{¶6} The court granted the State's motion to consolidate the three separate cases for trial. However, at the start of the trial, the State moved to sever case number 11CR084144 because it was having trouble locating the victim. The court, over defense's objection, granted the State's motion. A jury trial proceeded on case numbers 11CR084132 and 11CR084219. The jury found Bennett not guilty of all counts in case number 11CR084219, but guilty on all counts in case number 11CR084132, including the firearm specifications. Additionally, the court found Bennett guilty on the two repeat violent offender specifications in case number 11CR084132.

---

[1] Because case number 11CR084144 was severed from 11CR084132 (the case on appeal) there is no information about it in the record. We cite the charges based on the State's brief.

{¶7} The court merged the felonious assault count with the improperly discharging a firearm at or into a habitation count and sentenced Bennett to a total of 26 years in prison. Bennett now appeals and raises six assignments of error for our review. To facilitate the analysis, we rearrange the assignments of error.

## II

### Assignment of Error Number Three

THE TRIAL COURT ERRED BY GRANTING THE STATE'S MOTION TO JOIN THE CASES AT BAR.

{¶8} In his third assignment of error, Bennett argues that the court erred in consolidating the three cases against him. Specifically, Bennett argues that the court erred in consolidating the cases because the State did not establish that the "evidence to be introduced relative to one offense would be admissible in the trial on the others pursuant to Evid.R. 404(B)[,] or [] that, regardless of the admissibility of such evidence, the evidence relating to each charge is simple and direct."

{¶9} "It is well-settled that the law favors joinder." *State v. Merriweather*, 9th Dist. Lorain No. 97CA006693, 1998 WL 239773, *3 (May 6, 1998). "Crim.R. 14 permits the joinder of 'completely separate indictments.'" *State v. Miller*, 9th Dist. Lorain Nos. 10CA009922 & 10CA009915, 2012-Ohio-1263, ¶ 17, quoting *State v. Hatfield*, 9th Dist. Summit No. 23716, 2008-Ohio-2431, ¶ 14. "A defendant claiming prejudice by the joinder of offenses may move for severance under Crim.R. 14." *Merriweather* at *3. However, "[t]o preserve a claimed error under Crim.R. 14, * * * a defendant must renew his or her motion to sever either at the close of the State's case or at the conclusion of all of the evidence." *Miller* at ¶ 17. "A renewal of the motion is necessary because a Crim.R. 14 analysis examines any prejudice resulting from the joinder in light of the evidence introduced at trial." *State v. Hoffman*, 9th Dist. Summit No.

26084, 2013-Ohio-1021, ¶ 8. A defendant's failure to renew his or her objection to joinder results in a forfeiture of the issue on appeal. *See State v. Vu*, 9th Dist. Medina No. 11CA0042-M, 2012-Ohio-746, ¶ 37. Forfeiture of the issue forfeits all but plain error on appeal. *See State v. Boden*, 9th Dist. Summit No. 26623, 2013-Ohio-4260, ¶ 42.

{¶10} The State filed a motion to consolidate Bennett's three cases, and the court held a hearing. At that hearing, Bennett's counsel objected to the State's motion to consolidate, arguing that the cases should be tried separately because "the grand jury on the same day had issued three separate indictments rather than combining them all into one." Bennett further argued that "it would be prejudicial to [him]" to "proceed with all three cases at the same time," and requested that the State's motion to consolidate be dismissed. Ultimately, the court granted the State's motion and consolidated the cases for trial.

{¶11} The morning of trial, the State made an oral motion to sever one of the cases, 11CR084144, because it could not locate the victim. Bennett requested that the court sever all three cases and proceed to trial that day only on 11CR084132. The court granted the State's motion and denied Bennett's. Case numbers 11CR084132 and 11CR084219 were then tried together to a jury.

{¶12} Bennett did not renew his objection to the consolidation of the two cases at the end of the State's case or at the conclusion of all of the evidence. Because Bennett failed to renew his objection to the allegedly prejudicial joinder, he has forfeited all but plain error on appeal. *See State v. Simpson*, 9th Dist. Lorain Nos. 12CA010147 & 12CA010148, 2013-Ohio-4276, ¶ 21-22. Bennett, however, has not argued plain error, and "this Court will not construct a claim of plain error on a defendant's behalf if the defendant fails to argue plain error on appeal."

*State v. Daniels*, 9th Dist. Lorain No. 11CA010021, 2012-Ohio-2000, ¶ 13, quoting *State v. Arnold*, 9th Dist. Summit No. 24400, 2009-Ohio-2108, ¶ 8.

**{¶13}** Because Bennett has forfeited this issue on appeal and has not argued plain error, we decline to address the merits of his argument. Accordingly, Bennett's third assignment of error is overruled.

Assignment of Error Number Six

> THE TRIAL COURT ABUSED [ITS] DISCRETION AND ERRED BY ALLOWING THE STATE TO CONSOLIDATE THE CASES AT BAR AFTER THE TIME REQUIREMENTS DELINEATED IN CRIMINAL RULE 12.

**{¶14}** In his sixth assignment of error, Bennett argues that the court erred in granting the State's motion to consolidate his cases because it was filed after the deadline provided by Crim.R.12. We disagree.

**{¶15}** With limited exceptions, "[a]ll pretrial motions * * * shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. The court in the interest of justice may extend the time for making pretrial motions." Crim.R. 12(D). "The granting or denial of an untimely pretrial motion pursuant to Crim.R. 12([D]) is a matter within the trial court's discretion." *State v. Burkhardt*, 9th Dist. Summit No. 17223, 1996 WL 28167, *2 (Jan. 24, 1996). An abuse of discretion indicates that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶16}** Bennett was indicted in three separate cases on December 28, 2011. He was arraigned in case number 11CR084132 on January 5, 2012. On April 23, 2012, the State filed a motion to join the cases for trial. In its motion, the State argued that the "three incidents occurred within a three day span, thus many of the witnesses and pieces of evidence are the

same." It further argued that consolidation would not prejudice Bennett and would "prevent unnecessary duplication of evidence presented, and avoid the possibility of disparate outcomes."

{¶17} On April 27, 2012, the court held a hearing on the State's motion. The State argued that the indictments were a series of events that involved many of the same people and in the process of conducting discovery the State learned that "the discovery packet for each case [wa]s exactly the same." Bennett objected, arguing that the grand jury issued three separate indictments which indicated that the grand jury believed the cases should be tried separately. Additionally, without any explanation, Bennett asserted that a consolidation of the three cases for trial would be prejudicial to him. On May 1, 2012, the court granted the State's motion to consolidate and a trial convened on August 20, 2012, almost four months later.

{¶18} "It is well-settled that the law favors joinder." *State v. Samuels*, 9th Dist. Summit Nos. 25982, 25983, & 25984, 2012-Ohio-5401, ¶ 8, quoting *Merriweather*, 1998 WL 239773, at *3. "Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225 (1980).

{¶19} The prosecutor learned during discovery that the discovery packets for each of the three cases were exactly the same. The cases involved many of the same witnesses and evidence, and Bennett still had almost four months after the cases were consolidated to prepare for trial. Having reviewed the record, we cannot conclude that the court abused its discretion in granting the State's motion to consolidate the three cases after the deadline provided for in Crim.R. 12(D).

{¶20} Bennett's sixth assignment of error is overruled.

Assignment of Error Number Two

THE TRIAL COURT ERRED BY ALLOWING THE STATE TO CONSOLIDATE THREE CASES FOR TRIAL AND THEN LETTING THE STATE CONTINUE ONE OF THE THREE CASES ON THE DAY OF TRIAL BECAUSE THE STATE COULD NOT FIND A WITNESS THAT WAS NECESSARY FOR ITS CASE.

**{¶21}** In his second assignment of error, Bennett argues that the court erred in continuing one of three consolidated cases on the day of trial. We disagree.

**{¶22}** "The decision to grant or deny a continuance lies within the sound discretion of the trial judge, which requires the balancing of 'any potential prejudice to a [party against] concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *State v. Sauto*, 9th Dist. Summit No. 26404, 2013-Ohio-1320, ¶ 17, quoting *In re C.G.*, 9th Dist. Summit No. 26506, 2012-Ohio-5999, ¶ 8. In ruling on a motion for continuance, the court should consider, among other things:

> the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*State v. Unger*, 67 Ohio St.2d 65, 67-68 (1981). Because the decision to grant or deny a continuance lies within the sound discretion of the trial court, such decision will not be reversed absent a showing of an abuse of discretion. *State v. Dawalt*, 9th Dist. Medina No. 06CA0059-M, 2007-Ohio-2438, ¶ 9.

**{¶23}** When reviewing for an abuse of discretion, an appellate court may not merely substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). An abuse of discretion indicates that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶24} The morning of trial, the State requested a continuance for case number 11CR084144 because it could not locate the victim. The prosecutor informed the court that she "ha[d] a good idea" as to why the victim was not there and she believed she could "get [the victim] at a later time to be able to be available for the [c]ourt." Bennett did not object to the continuance, but, instead, requested that the court sever all three cases and proceed that day to trial only on case number 11CR084132. The court denied Bennett's request and reiterated its rationale for consolidating the cases. The court did, however, state that Bennett would "get [his] wish" on the 11CR084144 case and granted the State's request for a continuance.

{¶25} Bennett concedes that no prior continuances had been granted and that the record contains no evidence regarding the length of delay requested. Further, there is no evidence that Bennett was inconvenienced by a continuance that he himself did not oppose. Bennett requested that the court continue two of the three cases, and the court granted this request in part. Additionally, the prosecutor informed the court she had some difficulty locating the victim, but believed that the victim could be available to the court at a later date.

{¶26} After reviewing the record, we cannot conclude that the court's decision to grant the State's request for a continuance in case number 11CR084144 was arbitrary, unreasonable, or unconscionable. Because the court's decision was not an abuse of discretion, Bennett's second assignment of error is overruled.

Assignment of Error Number Four

THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO SEVER CASE NUMBER 11CR084144 ON THE DAY OF TRIAL.

{¶27} In his fourth assignment of error, Bennett argues that the court erred in severing one of the cases on the day of trial. Specifically, Bennett argues that the State did not establish that it was prejudiced by the joinder of case number 11CR084144.

{¶28} "If it appears that * * * the [S]tate is prejudiced by * * * [a] joinder for trial together of indictments, * * * the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." Crim.R. 14. "While relief from joinder is available under Crim.R. 14, the decision to grant severance is committed to the sound discretion of the trial court." *State v. Brown*, 1st Dist. Hamilton No. C-860381, 1998 WL 144502, *3 (Mar. 27, 1998). The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶29} The morning of trial, the State made an oral motion to continue case number 11CR084144 because it could not locate the victim. The prosecutor informed the court that she believed she knew why the victim was not present and thought that she would be able to produce the victim at a future court date. The State requested that the court proceed to trial with the two other cases and continue 11CR084144, effectively severing it.

{¶30} Bennett, through counsel, did not object to the severance of 11CR084144, but, instead, requested that the court sever both 11CR084219 and 11CR084144 and proceed to trial that day only on 11CR084132. The court denied Bennett's request and granted the State's motion to continue, severing case number 11CR084144.

{¶31} Assuming arguendo that the court's decision to sever only 11CR084144 was an abuse of discretion, Bennett has not explained how he was prejudiced in this case by such severance. "Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." *Beard v. Meridia Huron Hospital*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. Because Bennett has not articulated any prejudice in this case, 11CR084132, his fourth assignment of error is overruled.

Assignment of Error Number Five

THE VERDICT OF THE JURY ON CASE NUMBER 11CR084132 WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶32} In his fifth assignment of error, Bennett argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶33} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶34} Bennett was convicted of felonious assault, improperly discharging a firearm at or into a habitation, tampering with evidence, and having a weapon while under disability.

{¶35} A person is guilty of felonious assault if he or she knowingly "cause[s] or attempt[s] to cause physical harm to another * * * by means of a deadly weapon * * *." R.C. 2903.11(A)(2). "A person acts knowingly, regardless of his purpose, when he is aware that his

conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22 (B).

{¶36} A person is guilty of improperly discharging a firearm at or into a habitation when he or she, without privilege to do so, knowingly "[d]ischarge[s] a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual * * *." R.C. 2923.161(A)(1).

{¶37} A person is guilty of tampering with evidence when he or she, "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, * * * [a]lter[s], destroy[s], conceal[s], or remove[s] any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *." R.C. 2921.12(A)(1).

{¶38} Lastly, a person that has been convicted of a felony offense of violence may not "knowingly acquire, have, carry, or use any firearm."[2] R.C. 2923.13(A)(2). Any person that violates this provision is guilty of having a weapon while under disability. R.C. 2923.13(B).

{¶39} In addition to instructions on the foregoing offenses, the jury received the following instruction on complicity.

> A defendant may be found guilty of an offense if it is proven beyond a reasonable doubt that he is guilty of complicity in the commission of the offense. Before you can find the defendant guilty, you must find beyond a reasonable doubt, that the defendant knowingly: solicited or procured another to commit the offense; or that that person aided or abetted another in committing the offense; or conspired with another to commit the offense; or caused an innocent or irresponsible person to commit the offense.

---

[2] The parties stipulated that "[Bennett's] prior convictions of aggravated assault, simple robbery and shooting into a dwelling are felony offenses of violence as a matter of law."

{¶40} "The criminal intent of the aider and abettor 'can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed.'" *State v. Stephens*, 9th Dist. Summit No. 26516, 2013-Ohio-2223, ¶ 18, quoting *State v. Smith*, 9th Dist. Summit No. 25650, 2012-Ohio-794, ¶ 7. A person who is guilty of complicity "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F).

**Candice Cutlip**

{¶41} Candice Cutlip testified that in November 2011, she was living at 422 Kentucky Avenue in Lorain, Ohio, with her now husband, Tremaine Martin, and her three children. Martin has two children of his own, including a son with Angela Pruchniki. On the evening of November 13, 2011, Cutlip returned home to find the house had been ransacked. Cutlip filed a police report and informed the police that she suspected Pruchniki because the only pictures that were disturbed were of Cutlip and her children, while the photographs of Martin and his children were not touched.

{¶42} Cutlip testified that later that evening she received threatening calls and text messages from Amber Zadorozny, a friend of Pruchniki's. Cutlip also testified that at about 10:00 p.m., Zadorozny and her boyfriend, Bennett, along with seven or eight other individuals, were outside of her house, yelling for her to come outside. Cutlip called the police and remained in the house with Martin, and the group eventually left. At about 2:00 a.m., she testified that she heard "gunshots coming through [the] house." Cutlip explained that a bullet hole was found in her bedroom closet door, only inches from where she was lying in bed. Bullet holes were also found in her child's room and in the front door of the house. A total of seven bullets were found.

Cutlip testified that she received a text message from Zadorozny after the shooting which read, "Them bullets were for you and your man."

**Tremaine Martin**

{¶43} Martin testified that Zadorozny kept calling his phone threatening Cutlip and that he just kept hanging up on her. Martin said that on November 13, 2011, the house he shared with Cutlip had been broken into and, later that evening, a group of people were out in front of the house, waiting for him and Cutlip to come outside. Martin stated that he did not recognize any of the people, but that Cutlip did. Martin testified that, about 30 minutes before the shooting, he received a call from Pruchniki asking if their son was in the house with him. When he told Pruchniki that their child was with Pruchniki's father, she said that was all she wanted and hung up. Martin was in the bedroom "at least five feet from the closet" when he heard a shot come through the wall. Martin testified that he took cover and did not see the shooter or hear a car.

**Amber Zadorozny**

{¶44} Zadorozny testified that she "grew up five doors down" from Cutlip. In 2010, Zadorozny and Cutlip were not getting along and "words [were] exchanged." Zadorozny met Pruchniki on Facebook when she defended Pruchniki against Cutlip, and the two soon became friends. Zadorozny testified that, in November 2011, Pruchniki and Cutlip were "having problems with [Martin]." Zadorozny said that, on November 13, 2011, she was at home watching a movie with Bennett when Pruchniki called her from work. Pruchniki told her that she and Cutlip "had words on the phone." According to Zadorozny, Pruchniki asked them to go over to Cutlip's house to fight her. Zadorozny testified that they did go over to Cutlip's to fight, but that Cutlip would not come out of the house "and then that's when things escalated."

{¶45} Zadorozny stated that after Cutlip would not come out of her house Zadorozny and Bennett returned to her apartment and waited for her friend, Paige Gossett, to finish work. According to Zadorozny, Bennett asked her to set up a meeting with Cutlip at Central Park after midnight. After Gossett arrived, the three got into Bennett's car and, on the way to Central Park, picked up Fred Farris, a friend of Bennett's. According to Zadorozny, when Cutlip did not show at the park, Bennett became upset and decided that they were going to go over to Cutlip's house. Zadorozny said that Bennett "kept telling [her] that he had a surprise for [her]." Zadorozny explained that they drove over to Cutlip's and parked a street away. Gossett stayed in the car, and Bennett, Farris, and Zadorozny walked over to Cutlip's. Zadorozny testified that as they approached Cutlip's, Bennett told Farris and Zadorozny to walk ahead of him. When she turned around, Zadorozny saw Bennett, with "his hoodie up," shooting at Cutlip's house. Zadorozny said she heard seven to nine shots and recognized the gun Bennett was firing as his PK380. According to Zadorozny, she had seen Bennett many times before with the same gun and that Bennett "never went anywhere without it."

{¶46} Zadorozny testified that after the second shot, Farris and Zadorozny took off running and that they met up with Bennett back at the car. Bennett then drove them to the Overlook Apartments where Gossett threw Bennett's hooded sweatshirt over the cliff, and they sat and listened to the police scanner. According to Zadorozny, they then drove back to the area of Cutlip's to retrieve Bennett's gun, which he had dropped after the shooting. Zadorozny testified that Bennett put the gun in Gossett's purse and drove them to his house to change his clothes. Zadorozny further testified that Bennett later removed the gun from Gossett's purse when he dropped Gossett and Zadorozny off at Zadorozny's apartment.

{¶47} In her initial interview, Zadorozny told the police that neither she nor Bennett was involved in the shooting. Zadorozny testified that she was not truthful from the start because she knew that Bennett was on parole in Mississippi and would be facing 20 years in prison for a violation. According to Zadorozny, she told the police the truth when she learned that Bennett had identified her as the shooter. Zadorozny explained to the jury that she had pleaded guilty to felonious assault and improperly discharging a firearm into a habitation, understanding that she was complicit in the crime. She further explained that in exchange for her truthful testimony the State dismissed the firearm specification, thereby removing any mandatory prison time.

**Paige Gossett**

{¶48} Gossett testified that on November 13, 2011, she worked until 11:00 p.m. and then went over to Zadorozny's apartment. Gossett said that while she was at Zadorozny's, Zadorozny was "having altercations with [Cutlip]." Gossett testified that she, Bennett, and Zadorozny got into the car and picked up one of Bennett's friends. According to Gossett, she did not know where they were going, only that Bennett said "he had a surprise for [Zadorozny]."

{¶49} Gossett testified that, after the group drove around for a while, they parked a street away from Cutlip's house. Gossett said she was told to stay in the car because she had on a "really bright yellow shirt." Bennett, Zadorozny, and Bennett's friend left on foot, and, a few minutes later, Gossett heard gunshots. According to Gossett, Bennett returned to the car first and drove a short distance to retrieve "his gun that he dropped." Bennett then picked up Zadorozny and his friend, and the four went to the apartment complex by the lake. Gossett testified that Bennett handed his gun to Zadorozny, and Zadorozny put it in Gossett's purse.

{¶50} Gossett said that Bennett wanted to get rid of his hooded sweatshirt because it had gun powder residue on it, so she threw it over the cliff while they were parked at the apartment

complex by the lake. Bennett then drove them to his grandparents' house, where they sat for a few minutes. Gossett testified that Bennett then returned her and Zadorozny to Zadorozny's apartment and removed his gun from Gossett's purse.

**The Investigation**

{¶51} On November 13, 2011, Officer Jarrod Nighswander, of the Lorain Police Department, was working the 6 p.m. to 6 a.m. shift. Officer Nighswander testified that during that shift he responded to Cutlip's Kentucky Avenue home three times. The first time, he responded to a burglary complaint. The second time, he responded to a call that a couple of carloads of people were outside Cutlip's home. The last call was for shots fired. Detective Jacob Morris, of the Lorain Police Department, testified that "two spent Federal brand .380 auto shell casings" were recovered from across the street.

{¶52} Detective Michael Gidich, of the Lorain Police Department, interviewed Cutlip and Martin after the shooting. Cutlip informed Detective Gidich about the text message she received from Zadorozny. Detective Morris assisted Detective Gidich in interviewing Zadorozny. Ultimately, Zadorozny identified Bennett as the person who shot at Cutlip's house and also implicated Bennett in an attempted robbery that occurred the following day.

{¶53} Zadorozny told the officers that the day after shooting at Cutlip's house, Bennett came over to her apartment and the "bottom of his gun was missing." When Zadorozny asked Bennett what happened, he told her that he dropped the gun's magazine while trying to rob a tattoo artist of drugs. Zadorozny explained that it was the same PK380 that Bennett had used in the shooting at Cutlip's and that Ledail Scott, Bennett's cousin, was involved in the attempted robbery.

{¶54} Carlos Logsdon, a tattoo artist, testified that on November 15, 2011, about 1:00 a.m. there was a knock on the front door of his Forest Lane home. Logsdon said that when he opened the door a masked man hit him over the head with a gun. While Logsdon and the man wrestled, he saw another masked gunman trying to cock his gun, but it fell apart. Ultimately, Logsdon was able to push the men outside of the security doors and the police were called. Officer Jesse Perkins, of the Lorain Police Department, responded to that call.

{¶55} Officer Perkins testified that he recovered a gun magazine containing .380 bullets from the scene, which was sent for DNA testing. Shawn Weiss, associate technical director of the forensic identity department of Laboratory Corporation of America, testified that they "were able to develop a profile at all 15 genetic markers" from the magazine. The profile was a mixture of more than one person. The test was able to exclude Scott as a source of the DNA on the magazine, but Bennett could not be excluded as a contributor.

{¶56} Detective Morris testified a PK380 firearm with a missing magazine was found in a search of Scott's home. Detective Morris testified that a "federal trace" of the gun determined that it belonged to a Dolratta Moore. Moore testified that she and Bennett had dated and that Bennett had purchased the gun for her to use for protection. Moore said she was surprised to learn that the gun had been used in a violent crime and had been unaware that it was missing. She testified that the last time she saw the gun Bennett, Scott, and several other people were at her apartment.

{¶57} Detective Morris testified that a box of Federal brand .380 auto ammunition was found during a search of Bennett's car and the bullets contained in the box were not hollow-points. There were approximately five rounds missing from the box. Detective Morris testified that the ammunition found in Bennett's car was the same brand and caliber as some of the

ammunition found in the magazine recovered from Forest Lane. Detective Morris explained that the magazine contained three hollow-point bullets and four Federal brand .380 auto bullets. He further explained that the ammunition in Bennett's car was the same brand and caliber as the shells recovered from across the street from Cutlip's house.

{¶58} Bennett argues that his convictions are against the manifest weight of the evidence because there is no evidence that he had any type of feud with Cutlip or Martin. Instead, according to Bennett, the weight of the evidence points to Zadorozny as the one with the motive to shoot at Cutlip's house. Bennett argues that Zadorozny was the only witness to testify that Bennett had a gun and her testimony is not credible because, as the shooter, she had a motive to lie.

{¶59} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "In reaching its verdict, the jury was in the best position to evaluate the credibility of the witnesses and it was entitled to believe all, part, or none of the testimony of each witness." *State v. Shank*, 9th Dist. Medina No. 12CA0104-M, 2013-Ohio-5368, ¶ 29, citing *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. "This Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witnesses' testimony over the testimony of others." *State v. Vargas*, 9th Dist. Lorain No. 12CA010195, 2013-Ohio-4281, ¶ 23, quoting *State v. Brown*, 9th Dist. Wayne No. 11CA0054, 2013-Ohio-2945, ¶ 42.

{¶60} Zadorozny testified that she saw Bennett shoot into Cutlip's home with his PK380 firearm that she often saw him carrying. Moore testified that the last time she saw her gun was when Bennett, Scott, and several friends were at her apartment. Gossett testified that she heard

gunfire shortly after Bennett, Zadorozny, and Farris left the car on foot and headed toward Cutlip's house. Gossett testified that Bennett returned to the car first and retrieved the gun, which he had dropped a short distance away. According to Gossett, Zadorozny and Farris returned to the car shortly thereafter and Bennett drove them to the Overlook Apartments, where she threw Bennett's sweatshirt over the cliff. Gossett testified that Bennett wanted to dispose of his sweatshirt because it had gunpowder residue on it. After a careful review of the record, we conclude that Bennett's convictions are not against the manifest weight of the evidence. Bennett's fifth assignment of error is overruled.

Assignment of Error Number One

> IT WAS PLAIN ERROR FOR THE TRIAL COURT TO ALLOW TESTIMONY ABOUT BENNETT ENFORCING HIS CONSTITUTIONAL RIGHT TO REMAIN SILENT AND TO SPEAK TO AN ATTORNEY PURSUANT TO THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**{¶61}** In his first assignment of error, Bennett argues that his constitutional right to remain silent was violated when Detectives Gidich and Morris testified that Bennett terminated his interview with them and requested to speak to an attorney.

**{¶62}** "The Fifth Amendment to the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, ¶ 11. The Fifth Amendment applies to the states through the Fourteenth Amendment. *State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, ¶ 19. Additionally, when a person is subject to a custodial interrogation, he or she must be informed of certain rights, including his or her rights to remain silent and to an attorney. *Miranda v. Arizona*, 384 U.S. 436 (1966).

{¶63} "A suspect's right to an attorney during questioning * * * is derivative of his [or her] right to remain silent * * *." *Leach* at ¶ 13, quoting *Wainwright v. Greenfield*, 474 U.S. 284, 298-299 (1986) (Rehnquist, J., concurring). Once a person invokes his or her Fifth Amendment right to remain silent, the State cannot use the person's silence as substantive evidence of guilt in its case-in-chief. *See Wainwright*, 474 U.S. at 295 (post-arrest, post-*Miranda* silence inadmissible as substantive evidence of guilt in State's case-in-chief). *See also Leach* at ¶ 30 (use of "pre-arrest silence in the [S]tate's case-in-chief as *substantive* evidence of guilt subverts the policies behind the Fifth Amendment") (Emphasis sic.)

{¶64} Based on the record, it is unclear whether Bennett, at the time of the interview in question, had been arrested, whether the interview was a custodial interrogation, or whether Bennett had been given his *Miranda* warnings. However, Bennett concedes that he did not object to the testimony in question, and therefore, a plain error analysis applies. "[I]f a party forfeits an objection in the trial court, reviewing courts may notice only '[p]lain errors or defects affecting substantial rights.'" *State v. Riffle*, 9th Dist. Medina No. 07CA0114-M, 2008-Ohio-4155, ¶ 5, quoting *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 15.

> To correct a plain error, all of the following elements must apply: "First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[ ]' [to the extent that it] * * * affected the outcome of the trial."

(Alterations sic.) *State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Courts are to notice plain error 'only to prevent a manifest miscarriage of justice.'" *Payne* at ¶ 16, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶65} In its direct examination of Detective Gidich, the following exchange took place.

[PROSECUTOR:]   Detective, you mentioned that you recovered a sweatshirt from the cliff; was that ever shown to [ ] Bennett?

[DETECTIVE GIDICH:]   Yes, it was.   Referring back to m[y] report here, Detective Morris showed Mr. Bennett the sweatshirt.  He looked surprised to see it and then at that time is when [Bennett] asked for an attorney and no longer wished to speak with us.

[PROSECUTOR:]  Nothing further, Your Honor.

The following day, the State asked Detective Morris about discovering the sweatshirt on the cliff by Overlook Apartments.

[PROSECUTOR:]  Okay.  What did you then do next?

[DETECTIVE MORRIS:]  We confronted Mr. Bennett with the evidence that we recovered out.  We re-interviewed Mr. Bennett.

[PROSECUTOR:]  And what was his reaction to the sweatshirt?

[DETECTIVE MORRIS:]   Upon seeing the sweatshirt, he immediately, he appeared surprised that we had the sweatshirt and he immediately requested to end the interview.

[PROSECUTOR:]   Okay.   Did you have any other involvement with 422 Kentucky?

[DETECTIVE MORRIS:]  No * * *.

{¶66}  Even assuming that the testimony of Detectives Gidich and Morris violated Bennett's constitutional right to remain silent, we conclude that, based on record, it does not rise to the level of plain error.  The trial lasted three days and the prosecutor made no references to Bennett invoking his right to remain silent, his request for an attorney, or to the testimony of the Detectives quoted above.  Additionally, the jury acquitted Bennett on the charges in case 11CR084219.

{¶67}  By all accounts, in November 2011, Cutlip was not getting along with Zadorozny or Pruchniki.  Zadorozny and Gossett testified that, on the evening of November 13, 2011, Bennett told Zadorozny that he had a surprise for her and that they got into Bennett's car and

picked up a friend of his, Farris. Zadorozny and Gossett further testified that Bennett parked the car a street away from Cutlip's house, then Zadorozny, Bennett, and Farris exited the vehicle. Zadorozny testified that she was walking with Farris, ahead of Bennett, when she turned around and saw Bennett shooting at Cutlip's home with his PK380 firearm. Gossett testified that she stayed in the car and heard shots fired a few minutes after the group left on foot. The group returned to the car and Bennett drove them to the Overlook Apartments where Gossett threw Bennett's sweatshirt over the cliff to dispose of any evidence of gunshot residue.

{¶68} After careful review of the record, we cannot conclude that the testimony regarding Bennett's invocation of his right to remain silent affected the outcome of his trial. Because Bennett has not established prejudice, we do not find that his alleged error rises to the level of plain error. *See Barnes*, 94 Ohio St.3d at 27. Accordingly, his first assignment of error is overruled.

### III

{¶69} Bennett's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETH WHITMORE
FOR THE COURT

MOORE, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

KENNETH N. ORTNER, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.