[Cite as *State v. Perrymond*, 2014-Ohio-2863.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

| STATE OF OHIO | | C.A. No. 13CA0046-M |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JUAN R. PERRYMOND | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No. 13 CR 0084 |

DECISION AND JOURNAL ENTRY

Dated: June 30, 2014

HENSAL, Presiding Judge.

{¶1} Appellant, Juan R. Perrymond, appeals his convictions in the Medina County Court of Common Pleas. For the following reasons, this Court affirms.

I.

{¶2} When Terry Pugh arrived home on the evening of December 26, 2012, he was attacked from behind as he opened the front door of his apartment. One man, who Mr. Pugh identified as Mr. Perrymond, pushed him into two tables and a portable dishwasher before slamming him down on the floor where he held him down and punched him in the face several times. A second unidentified man rifled through Mr. Pugh's pockets and took his wallet, cell phone, and cigarettes. Mr. Perrymond and his accomplice then fled the scene.

{¶3} Earlier in the evening, Mr. Pugh had visited the home of Jo/Ann Yates, who lived in an adjacent apartment building. Mr. Pugh told the responding police officers that he saw his assailants at Ms. Yates's apartment that night although he did not know their names. The

investigation stalled for several weeks until the police received a tip from a confidential informant that Mr. Perrymond was at Ms. Yates's home that night. Mr. Pugh later identified Mr. Perrymond as one of his attackers from a photo lineup.

{¶4} Mr. Perrymond was charged with the aggravated burglary, kidnapping, and robbery of Mr. Pugh. A jury convicted him of all the offenses and he was sentenced to serve four years in prison. Mr. Perrymond has appealed and raises three assignments of error for this Court's review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF MR. SPROLES TO REMAIN AS PART OF THE RECORD ONCE IT WAS DETERMINED THAT HE WAS A CONFIDENTIAL INFORMANT THAT WAS NEVER IDENTIFIED TO THE APPELLANT AND HIS COUNSEL.

{¶5} In his first assignment of error, Mr. Perrymond argues that the trial court erred in not excluding the testimony of Richard Sproles when the State allegedly failed to disclose to him that Mr. Sproles was a confidential informant and questioned him at trial without disclosing that fact to the jury. We disagree.

{¶6} The State called Mr. Sproles as a witness during its case-in-chief. It did not, however, question him about anything other than the events of December 26, 2012. Specifically, it did not question Mr. Sproles about the circumstances of his subsequent anonymous telephone call to the police department and interview with the investigating detective that occurred several weeks after Mr. Pugh's attack. Mr. Perrymond also did not cross-examine him on these subjects.

{¶7} The State subsequently called the investigating officer, Detective Sara Lynn, as a witness during its case-in-chief. She testified that the police department received an anonymous telephone call from someone who claimed to have information about the incident but whose

identity needed to remain confidential. On cross-examination, Mr. Perrymond questioned Detective Lynn about the contents of her report and marked the document as a defense exhibit. On redirect examination, Detective Lynn testified that the individual identified in her report as a confidential informant was Richard Sproles. According to Detective Lynn, Mr. Sproles told her that a person known as "Rick" was involved in the crime. From Mr. Sproles's information and with additional investigation, she was able to develop Mr. Perrymond as a suspect. On recross-examination, Mr. Perrymond asked Detective Lynn why Mr. Sproles did not mentioned his conversation with her when he testified earlier in the trial. The State objected, and an extended conversation occurred on the record outside of the jury's presence about the police report and Mr. Sproles's earlier testimony as well as Mr. Perrymond's ability to question the witness in that regard. Mr. Perrymond maintained that it was not until Detective Lynn's testimony that he first learned Mr. Sproles was the confidential informant mentioned in the police report. The State maintained that his identity was expressly disclosed in the report. After the State read the pertinent portions of the report into the record, the trial court sustained the State's objection to the question.

{¶8} "Trial courts possess broad discretion in determining the admissibility of evidence." *State v. Myers*, 9th Dist. Summit No. 25737, 2012-Ohio-1820, ¶ 9, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). However, in this case, Mr. Perrymond has forfeited all but plain error review as he was aware of the alleged error but failed to bring it to the trial court's attention at a time when it might have corrected the error. *State v. Mohamed*, 9th Dist. Medina No. 11CA0050-M, 2012-Ohio-3636, ¶ 22. We note that the matter was brought to the trial court's attention by the objection of the State to Mr. Perrymond's questioning of Detective Lynn rather than through his own objection. Assuming arguendo that Mr. Perrymond was not aware

that Mr. Sproles was a confidential informant until Detective Lynn testified, he failed to move to strike Mr. Sproles's testimony, move for a mistrial, or recall Mr. Sproles as a witness after acquiring such information. Further, Mr. Perrymond has not argued plain error in his brief. We have explained that "this Court will not construct a claim of plain error on a defendant's behalf if the defendant fails to argue plain error on appeal." *State v. Bennett*, 9th Dist. Lorain No. 12CA010286, 2014-Ohio-160, ¶ 12, quoting *State v. Daniels*, 9th Dist. Lorain No. 11CA010021, 2012-Ohio-2000, ¶ 13.

{¶9} Because Mr. Perrymond has forfeited this issue on appeal and has not argued plain error, this Court declines to address the merits of his argument. Accordingly, his first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY OF THE CHARGES BECAUSE THE FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} Mr. Perrymond argues in his second assignment of error that his convictions are against the manifest weight of the evidence. This Court does not agree.

{¶11} To determine whether Mr. Perrymond's convictions are against the manifest weight of the evidence, this Court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The appellate court should only exercise its

power to reverse a judgment as against the manifest weight of the evidence in exceptional cases. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

{¶12} Mr. Perrymond was convicted of aggravated burglary under Revised Code Section 2911.11(A). This section provides that:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶13} He was also convicted of kidnapping under Revised Code Section 2905.01(A)(2). This section provides that "[n]o person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter[.]"

{¶14} Finally, Mr. Perrymond was convicted of robbery under Revised Code Section 2911.02(A)(2). This section provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another[.]"

**Terry Pugh**

{¶15} The victim, Terry Pugh, testified that he went to Jo/Ann Yates's apartment during the early evening of December 26, 2012, to visit and to ask for a ride to go grocery shopping. When he arrived, Ms. Yates, her daughter, and Mr. Sproles were at the apartment. According to Mr. Pugh, Alex Ivy and another individual arrived later and went directly upstairs. Ms. Yates

asked her friend, Bradley Bokar, to drive Mr. Pugh to the store using her vehicle. Mr. Pugh testified that Mr. Bokar would have seen the $420 in cash he had in his wallet when he opened it up to take out the food stamp card he used to pay for his groceries.

{¶16} Mr. Pugh testified that he returned to Ms. Yates's home after shopping. According to him, Mr. Perrymond, who he knew as "Juan," and a friend arrived and went into the kitchen. Mr. Bokar also went in, but later walked out of the kitchen. Mr. Perrymond was still in the kitchen when Mr. Pugh decided to leave. After walking across the parking lot and checking his mailbox, he opened the door to his home. Mr. Pugh described being pushed from behind by two people as soon as he opened the door to his apartment. He testified that Mr. Perrymond spun him around so that the men were face-to-face, slammed him into two tables and a portable dishwasher before he threw him down on the floor, placed a knee on his chest to hold him down, and punched him in the face three or four times. According to Mr. Pugh, Mr. Perrymond then told his accomplice, "Ike, go through his pockets and take everything he's got." The accomplice removed Mr. Pugh's cell phone, cigarettes, and wallet from his pockets. The men then fled the apartment.

{¶17} Mr. Pugh got up from the floor and used his neighbor's telephone to call the police. He was transported to the hospital with pain from bruising to his ribs and face and difficulty breathing. According to Mr. Pugh, although he knew Mr. Perrymond from having seen him at Ms. Yates's home on more than one occasion, he told Detective Lynn that he did not know his assailants. He attributed this to the fact that he was "dazed" and "confused" due to the pain and difficulty breathing he sustained as a result of his injuries. Mr. Pugh maintains that he told Detective Lynn that "two black guys" who were previously at Ms. Yates's apartment accosted him.

{¶18} Mr. Pugh further testified that there was "no doubt in [his] mind" that Mr. Perrymond was the man who punched him and instructed his accomplice to take his property. According to Mr. Pugh, he knew that Mr. Perrymond was one of the men who attacked him because he recognized his voice and saw his face during the attack despite the fact that it was dark outside and there were no lights on in his apartment. Mr. Pugh acknowledged that he did not get a good look at Mr. Perrymond's accomplice. He testified that the accomplice was also black based on his manner of speech.

**Jo/Ann Yates**

{¶19} Ms. Yates testified that, when the police asked her that night if there were "two tall black" men at her house, she said, "[N]o." She acknowledged denying multiple times that Mr. Perrymond was at her house because the description the police gave her of a "tall black man" did not match his description since, in her estimation, he was Caucasian. According to Ms. Yates, since she only knew Mr. Perrymond as "Rick," she denied that he was at her apartment until the police specifically asked whether "Rick" was there. Once the police used the name "Rick," which was several weeks after the incident, Ms. Yates confirmed that he was present in her apartment that night. She further testified that Mr. Perrymond spoke with both Mr. Ivy and Mr. Bokar the night of Mr. Pugh's attack.

**Alex Ivy**

{¶20} Mr. Ivy testified that, at the time of the incident, he was temporarily living at Ms. Yates's apartment. According to him, he arrived home from work around 5:30 p.m. and went straight upstairs where he remained until the police called him downstairs to question him. Mr. Ivy testified that he was friends with Mr. Perrymond, who he knew as "Rick." He denied either

seeing him at Ms. Yates's apartment on December 26, 2012, or speaking with him in the kitchen. According to Mr. Ivy, he saw Ms. Yates and Mr. Sproles that night, but not Mr. Pugh.

**Richard Sproles**

{¶21} Mr. Sproles testified that he saw Ms. Yates, Mr. Bokar, Eric Buckingham, Mr. Pugh and Mr. Perrymond at Ms. Yates's apartment on the night in question. According to Mr. Sproles, he did not know Mr. Perrymond at the time and only later found out his name was "Rick." He testified that Mr. Perrymond was in the kitchen with Mr. Bokar "laughing, cutting up" along with one or two other people. Mr. Sproles admitted that portions of the evening were "fuzzy" as he had consumed alcohol that night.

**Bradley Bokar**

{¶22} Mr. Bokar testified that Mr. Sproles, "Audrey," Eric Buckingham, Ms. Yates, her daughter, "Gucci," Mr. Pugh and Mr. Perrymond were at Ms. Yates's apartment prior to him driving Mr. Pugh to the store for groceries. After returning from the store, Mr. Bokar, Mr. Perrymond, and several other people were in the kitchen talking and "chilling."

**Investigation**

{¶23} Officer Brian Wagner testified that, upon arriving at the scene on the night of the incident, he spoke with Ms. Yates as he received information from the other responding officers that the suspect was previously at her apartment. When he arrived, Ms. Yates, her daughter, and Mr. Sproles were present. Ms. Yates later revealed that Mr. Buckingham was upstairs. It was only after Officer Wagner went upstairs that he discovered Alex Ivy was also there. According to Officer Wagner, he asked Ms. Yates if a black male wearing dark clothes was at her apartment at the same time as Mr. Pugh. Ms. Yates denied knowing anyone who fit that description. Officer Wagner denied telling Ms. Yates that the suspect was tall.

{¶24} Officer Kelly Moran testified that she accompanied Officer Wagner to Ms. Yates's apartment. She further testified that, later that night, she showed Mr. Pugh a photo lineup of possible suspects, which included a photo of Mr. Ivy, but not Mr. Perrymond. Mr. Pugh did not identify anyone in the lineup as a suspect.

{¶25} Detective Lynn testified that, when she arrived on scene, Mr. Pugh's apartment looked disheveled with the portable dishwasher pushed up against the refrigerator and bags of groceries strewn all over the floor. While one of Mr. Pugh's neighbors heard noises that sounded like thuds and punching coming from his apartment, the neighbor was not able to provide any additional information. Mr. Pugh's other neighbor, who gave him her cell phone to call police, also could not provide any additional information despite the fact that she was outside shoveling snow at the time of the incident. Detective Lynn further testified that the responding officers told her that Mr. Pugh said that, while he could not name his assailants, he recognized their faces and knew they were just at Ms. Yates's apartment.

{¶26} She also spoke with Ms. Yates approximately one hour after Officers Wagner and Moran had spoken with her. During this conversation, Ms. Yates eventually revealed that Mr. Bokar had been there. According to Detective Lynn, when she asked Ms. Yates who was upstairs, she again only mentioned Mr. Buckingham and not Mr. Ivy. It was not until Mr. Buckingham came downstairs that she discovered Mr. Ivy was also upstairs. During this interview, Ms. Yates never mentioned that Mr. Perrymond was also at her apartment that night despite being asked numerous times for the names of anyone who was there. Detective Lynn testified that Mr. Sproles continually interrupted Ms. Yates during the interview to fill in information. Ms. Yates kept telling him to be quiet. During a subsequent interview after

December 26, 2012, Ms. Yates revealed that Mr. Perrymond was at her apartment on the date of Mr. Pugh's attack.

**{¶27}** According to Detective Lynn, while interviewing Mr. Bokar a few days after the incident, he revealed that he knew what happened but refused to identify anyone involved. Mr. Bokar told Detective Lynn that he told the men at the apartment that Mr. Pugh owed him money because he had paid for his groceries at the store. Upon review of the store's surveillance video, Detective Lynn discovered that it was not true that Mr. Pugh owed Mr. Bokar money as the video revealed that Mr. Pugh used his own food stamp card to pay for the groceries. Detective Lynn testified that Mr. Bokar told her that he was in Ms. Yates's kitchen with two black males "just joking around" when Ms. Yates told them to "stop whispering about whatever they were whispering about" and kicked the black males out of her apartment.

**{¶28}** After receiving information from a confidential informant, later revealed to be Mr. Sproles, Detective Lynn prepared a second photo lineup, which included a photo of Mr. Perrymond, and showed this new photo lineup to Mr. Pugh. Mr. Pugh identified Mr. Perrymond as his assailant with 100 percent certainty. Detective Lynn testified that, after showing him the lineup with Mr. Perrymond's picture, Mr. Pugh denied knowing him. When asked why Mr. Pugh testified that he did know him, Detective Lynn testified that it was her belief that he did not know his name until closer to trial and only then realized he had known Mr. Perrymond all along.

**{¶29}** Mr. Perrymond argues that there was no eyewitness testimony that placed him at Mr. Pugh's apartment. He also points out that some of the witnesses' testimony, including from Mr. Pugh himself, was inconsistent. He highlights the fact that, while Mr. Pugh testified that he

did know Mr. Perrymond, Detective Lynn testified that he earlier told her that he did not know him.

{¶30} All of the arguments raised by Mr. Perrymond concern witness credibility, which is primarily an issue for the jury to evaluate. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Further, "[i]n reaching its verdict, the jury was entitled to believe all, part, or none of the testimony of each witness." *State v. Howse*, 9th Dist. Lorain No. 12CA010251, 2012-Ohio-6106, ¶ 45. "[A] conviction is not against the manifest weight [of the evidence] because the jury chose to credit the State's version of the events." *State v. Minor*, 9th Dist. Summit No. 26362, 2013-Ohio-558, ¶ 28, quoting *State v. Breneman*, 9th Dist. Wayne No. 11CA0039, 2012-Ohio-3632, ¶ 9.

{¶31} After a careful review of the record, we cannot say that this is the exceptional case wherein Mr. Perrymond's convictions were against the manifest weight of the evidence. Given the fact that Mr. Pugh positively identified Mr. Perrymond from a blind photo lineup with 100 percent certainty that he was his attacker, and testified at trial that there was "no doubt" in his mind that Mr. Perrymond was his attacker, this Court cannot conclude that the jury clearly lost its way in convicting Mr. Perrymond of the offenses. While Mr. Pugh appeared to equivocate on the issue of whether he knew Mr. Perrymond prior to the attack, he did not waiver on his identification of the defendant as his assailant. Furthermore, Mr. Pugh testified that he saw his attackers at Ms. Yates's apartment earlier that evening. More than one other witness testified including, eventually, Ms. Yates herself, that Mr. Perrymond was at her apartment that night before the attack occurred. Accordingly, Mr. Perrymond's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY ALLOWING THE STATE TO ELLICIT EVIDENCE FROM POLICE OFFICERS AS TO WHETHER THEY HAD TAKEN A STATEMENT FROM THE APPELLANT.

{¶32} In his third assignment of error, Mr. Perrymond argues that the trial court violated his Fifth Amendment right against self-incrimination by allowing the State to elicit testimony from the responding police officers that they did not speak to him during their investigation. This Court disagrees.

{¶33} "Pursuant to the Fifth Amendment to the United States Constitution, one cannot be compelled to be a witness against oneself. This is expressed as the right to remain silent when questioned by law enforcement." *State v. Peasley*, 9th Dist. Summit No. 25062, 2010-Ohio-4333, ¶ 5, citing *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, ¶ 11-13. "Use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *Leach* at the syllabus.

{¶34} At trial, the State asked Officer Wagner:

Q: * * * Is there anything else that you did, as far as checking the area for suspects * * *?

A: Yes. * * * We looked around the area with the description we had. It was difficult to * * * piece things together at that point.

* * *

Q: You never spoke to Terry Pugh then?

A: No.

Q: You never saw him?

A: No.

Q: And you never saw or spoke with [Mr. Perrymond]; is that correct?

A:     I did not, no.

{¶35}  The State also asked Officer Moran about her assistance in showing Mr. Pugh a photo lineup the night of the attack:

Q:     And was [Mr. Pugh] able to pick anybody up out of the lineup?

A:     No.

Q:     Was [Mr. Perrymond] in that lineup where he wasn't able to pick somebody out?

A:     I don't recall.

Q:     * * * Was Alex Ivy in that lineup?

A:     I believe so, yes.

Q:     And he did not pick anyone out?

A:     Correct.

Q:     You were not involved in any other lineups that Mr. Pugh did, right?

A:     No.

Q:     You never spoke with [Mr. Perrymond], did you?

A:     No.

{¶36}  Mr. Perrymond failed to object to either of these lines of questioning at trial. Accordingly, this Court reviews his assignment of error for plain error. *Peasley* at ¶ 8. Criminal Rule 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

> To correct a plain error, all of the following elements must apply: 'First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[ ]' [to the extent that it] * * * affected the outcome of the trial.'

*State v. Bennett*, 9th Dist. Lorain No. 12CA010286, 2014-Ohio-160, ¶ 64, citing *State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 9.

**{¶37}** This Court is not convinced, after reviewing the questions within the context of the entire line of questioning, that the State affirmatively sought to use Mr. Perrymond's silence as substantive evidence of his guilt. In both instances, the State's question about whether the officer spoke with Mr. Perrymond occurred within the context of questioning about the officer's actions on the night of December 26, 2012, to locate the suspects. The questions do not suggest that either Officer Wagner or Officer Moran had any contact with Mr. Perrymond after his arrest several weeks later. Further, it is clear from reviewing the questions and corresponding testimony in context that the State was attempting to demonstrate that, despite testimony that Mr. Perrymond was at the apartment complex in question at the time Mr. Pugh was attacked, he was not there while officers went door-to-door during the subsequent investigation. This corresponds with Mr. Perrymond's suggestion at trial that the police took Mr. Pugh's statements at face value without conducting a full investigation into the matter.

**{¶38}** We cannot say that the State's isolated questions and the testimony they elicited amounted to error, plain or otherwise, in violation of Mr. Perrymond's constitutional right against self-incrimination. Accordingly, his third assignment of error is overruled.

III.

**{¶39}** Mr. Perrymond's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

CARR, J.
WHITMORE, J.
CONCUR.

APPEARANCES:

CONRAD G. OLSON, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.